IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | | |
|---|---|---|
| K.T., a minor child by and through his parents SANDRA TIMMONS and DAVID TIMMONS as Next Friends and Natural Guardians of K.T.; and SANDRA TIMMONS and DAVID TIMMONS individually<br><br>Plaintiffs<br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant | § § § § § § § § § § § § § § § § | No. _____ |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Sandra Timmons and David Timmons, individually and on behalf of K.T., a minor child, by and through their counsel of record, allege as follows:

**I.**
**PARTIES, JURISDICTION, SERVICE OF PROCESS, AND VENUE**

1.1. This is a medical malpractice case brought under the Federal Tort Claims Act for severe and permanent injuries suffered by Plaintiff, K.T., a minor child.

1.2. Plaintiffs Sandra and David Timmons are the biological parents of K.T., a minor child. They reside in Norman, Oklahoma.

1.3. The Defendant is the United States of America.

**1.4.** This Federal District Court has jurisdiction because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–80, commonly known as the Federal Tort Claims Act (FTCA), which vests exclusive subject matter jurisdiction in the Federal District Courts.

**1.5.** The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Original Complaint on Pamela C. Marsh, United States Attorney for the Northern District of Florida, by certified mail, return receipt requested at the United States Attorney's office:

> ATTN: Civil Process Clerk
> 21 East Garden Street
> Suite 400
> Pensacola, FL 32502;

and by serving a copy of the Summons and Original Complaint on Eric Holder, Attorney General of the United States, by certified mail, return receipt requested, at the Attorney General's office:

> ATTN: Civil Process Clerk
> 10th & Constitution Avenue, N.W.
> Washington, D.C. 20530

**1.6.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the United States is the Defendant and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## II.
## LIABILITY OF THE UNITED STATES OF AMERICA

2.1.    This case is commenced and prosecuted against the United States of America pursuant to and in compliance with 28 U.S.C. §§ 2671–80 (the Federal Tort Claims Act or FTCA). Liability of the United States is predicated specifically on 28 U.S.C. §§ 1346(b)(1) and 2674 because the personal injuries and resulting damages of which the complaint is made, were proximately caused by the negligence, wrongful acts or omissions of employees of the United States of America at the Fort Walton Beach Medical Center in Florida, while acting within the scope of their office of employment, under circumstances where the United States, if a private person, would be liable to the Plaintiffs, in the same manner and to the same extent as a private individual under the laws of the State of Florida.

2.2.    At all times relevant to these matters, the employees, agents, apparent agents, servants or representatives of the United States were subject to the United States' right to control, including substantial supervision and direction over their day-to-day activities.

## III.
## JURISDICTIONAL PREREQUISITES

3.1.    Plaintiffs plead, pursuant to 28 U.S.C. §§ 2672 and 2675(a), that the claims set forth herein were filed with and presented administratively to the Defendant's agency, the United States Department of the Air Force, within the applicable statute of limitations for the claims of Sandra and David Timmons, individually and on behalf of K.T., a minor child.

**3.2.** Following receipt of Plaintiffs' timely filed claims, the Department of Air Force initially denied Plaintiffs' claims on August 10, 2010. Pursuant to the applicable provisions of the FTCA and 28 C.F.R. 14.9(b), Plaintiffs filed a request for reconsideration which was received by the Department of Air Force on November 22, 2010, within six (6) months of the original denial. Plaintiffs received a final denial of their claim on April 12, 2012. Plaintiffs filed this suit in the appropriate Federal District Court within six (6) months of the final denial.

**3.3.** Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to commencement and prosecution of this litigation.

## IV.
## THE AIR FORCE IS AN AGENCY OF THE UNITED STATES

**4.1.** The United States Department of Air Force is an agency of the United States of America. At all material times, the United States of America through its agency had an External Resource Sharing Agreement for Obstetric and Newborn Nursery Services with Fort Walton Beach Medical Center, whereby the United States of America assumed responsibility for all actions by designated healthcare personnel acting within the course and scope of healthcare functions authorized by the United States' agency.

**4.2.** Under this agreement, "any remedy for personal injury, including death, caused by [healthcare personnel's] negligence or wrongful acts or omissions shall be against the United States as provided by the Federal Tort Claims Act and other applicable statutes, and not against the individual military health care personnel."

## V.
## COURSE AND SCOPE OF EMPLOYMENT

5.1.   At all material times, all persons involved in the medical and health care services provided to Plaintiffs at Fort Walton Beach Medical Center that are the subject of this suit, were acting within the course and scope of such employment with the federal government and providing care authorized by the United States of America, through its agency.

## VI.
## FACTS

6.1.   This is a case of medical negligence in which a healthy unborn baby (K.T.) suffered severe and permanent brain damage because the medical professionals caring for the unborn baby ignored signs that the baby was distressed, chose to administer Pitocin (Pitocin—also called oxytocin—is a medication that causes the uterus to contract and is used to induce labor) when the drug was contraindicated, and failed to effect a timely and safe delivery before the baby suffered a devastating brain injury.

6.2.   Sandra Timmons was 36 years old during her pregnancy with K.T., a boy. This was Ms. Timmons' first pregnancy. Her estimated due date (EDD) was May 17, 2005. She served in the Air Force and was a medical technologist recently returned from a tour in Iraq prior to her delivery. Before K.T.'s delivery, Ms. Timmons' pregnancy had been uneventful and progressing without complication. The medical records, ultrasounds, and biophysical profile of K.T. showed that K.T. was developing normally in utero.

**6.3.** Sandra Timmons arrived at Fort Walton Beach Medical Center on May 13, 2005, with spontaneous rupture of her membranes. Her fluid was clear. At this time, she was 38 weeks and 4 days into her pregnancy which is full term. She had a normal blood pressure of 130/84. Because Ms. Timmons was 36 years old and with her first pregnancy (and for no other reason), she was classified as high risk. This meant that the healthcare providers were required to provide Ms. Timmons and her baby special attention during the labor course. Specifically, attention needed to be given to the fetal heart rate monitor (also called the "fetal monitor strip" or "fetal heart tracing") because it is used by healthcare providers to assess the baby's condition in utero and during the process of labor, and it provides healthcare providers with information about whether the baby is suffering any distress (also known as fetal "compromise" or "non-reassuring" signs on the tracing itself). The fetal heart monitor also monitors the mother's heart rate and contractions during labor. Simple oversight of the fetal heart monitor is required to ensure that the monitor is properly tracking the baby's heart rate, not just the mother's.

**6.4.** An external fetal monitor was applied at 02:41 on May 13, 2005. The fetal heart monitor showed a normal baseline heart rate for the baby of approximately 120 BPM (beats per minute), good variability and accelerations. The fetal heart tracing at this time was reactive and reassuring (positive signs indicating good fetal well-being). So upon admission to Fort Walton Beach Medical Center, the medical records confirm that K.T. was healthy and neurologically intact. Importantly, at the time of admission the fetal heart monitor also showed that Ms. Timmons was experiencing contractions every two (2) minutes. At 03:13, Sandra Timmons was 3 centimeters dilated, 80% effaced

(effacement is the measure of the thinning of the cervix), and the baby was at -1 station (station is the measurement of the baby's descent in the pelvis). Ms. Timmons' labor was progressing normally, but at 03:45 the nurse midwife ruptured the forebag revealing clear fluid and discussed the use of Pitocin.

6.5. Between 05:00 and 05:15, Sandra Timmons experienced three plus contractions in ten minutes. Despite experiencing frequent contractions without artificial stimulus, Pitocin is started at 05:15 by the Fort Walton Beach healthcare providers. Starting Pitocin on a patient who is already experiencing consistent contractions is dangerous because it can cause uterine hyperstimulation, which in turn causes unnecessary and possibly dangerous stress on the baby. Use of Pitocin in this situation is unnecessary and contraindicated.

6.6. Predictably, Ms. Timmons experienced excessive and frequent contractions in response to initiation of Pitocin. Her uterine activity became excessive with 6+ contractions in 10 minutes. At 06:50, in association with the excess uterine activity and increased variability, the baby experienced a deceleration to 90 BPM (normal baseline heart rate for a baby in utero is between 120 BPM and 160 BPM), which returns to baseline after several minutes. Deceleration is a decrease in the fetal heart rate that can indicate inadequate blood flow to the baby. The Fort Walton Beach healthcare providers did not discontinue Pitocin. Instead, they continued administration of Pitocin and only reduced the dosage from 6mU/min to 4mU/min in response to this evidence of uterine hyperstimulation.

**6.7.** Uterine hyperstimulation is a well-known complication that can occur with excessive use of Pitocin during labor. When Pitocin is used inappropriately—as in this case when contractions are occurring frequently enough or labor is otherwise progressing normally—uterine hyperstimulation occurs. The Pitocin causes the uterus to contract too frequently ("stacking" of contratcions); the contractions last too long; or the uterus cannot relax enough between contractions in order to provide the baby with enough recovery time. As a result, uterine hyperstimulation frequently causes a decrease in the flow of blood containing oxygen from the mother to the baby which causes hypoxia (lack of oxygen) and acidosis in the baby. Eventually, the restriction of oxygen to the baby can cause injury to the baby's organs, including the heart and brain. Because laboring mothers respond differently to Pitocin and uterine hyperstimulation caused by Pitocin is a well-known complication, it is very important that medical providers carefully monitor the mother and baby through the fetal heart monitor for signs of uterine hyperstimulation and possible hypoxia or fetal distress.

**6.8.** At 10:08 when pushing started, only the maternal heart rate pattern was showing on the monitor rather than the fetal rate. No baseline fetal heart rate was definable after this time as the maternal heart rate and the fetal heart rate interchange recordings and there are frequent decelerations. Because Pitocin was being used and Ms. Timmons' already exhibited evidence of uterine hyperstimulation, the Fort Walton Beach healthcare providers should have identified the overlap maternal/fetal recordings and quickly resolved the issue so that they could monitor the fetal heart rate. Instead, the healthcare providers continued with labor (the nursing notes document three hours of pushing) and

the administration of Pitocin in the setting of uterine hyperstimulation without proper monitoring of the baby. By failing to do so, they were not monitoring the baby for long stretches of time and were unable to respond to the effect the hyperstimulation was having on the baby. At a minimum, placement of a fetal scalp electrode would have allowed the healthcare providers to properly monitor the baby but this was not done. In essence, the Fort Walton Beach healthcare providers were "flying blind" at the most critical time.

**6.9.** Around 11:30, there were no less than 7 contractions in 9 minutes with less than 1 minute of rest time between contractions and pushing with 6 of the 7 contractions. This represents an assault on the baby both from the excessive frequency of contractions limiting oxygenation of the baby and excessive pressure on the fetal skull limiting cerebral blood flow.

**6.10.** Between 12:09 and 12:11, the fetal heart monitor showed the fetal heart rate rising rapidly to 180 BPM (this is known as fetal "tachycardia" which is an abnormally high heart rate indicating possible fetal distress). At 12:30, the fetal heart rate was 190 BPM with absent variability, indicating that the baby has been severely injured. K.T. was delivered eight minutes later at 12:38.

**6.11.** At the outset of labor, the fetal heart monitor readings were reassuring in terms of normal fetal behavior and the absence of oxygen deprivation. Over time with excessive uterine activity combined with relentless pushing and loss of fetal information, the baby deteriorated to the point of neurological injury just prior to delivery.

6.12.  K.T. was born depressed. The pediatrician was called and arrived two minutes after birth. K.T. is resuscitated with positive pressure ventilation and then intubated. K.T. remained on the ventilator in the nursery. Chest x-rays revealed left atelectasis (collapsed left lung) and ETT in the right mainstem bronchus. The medical records note seizures beginning at 20 hours post-delivery. K.T. is transferred to Sacred Heart Hospital at 21 hours for seizures. His EEG reads abnormal, showing seizures and a head ultrasound revealed small hypoechoic areas in the choroid plexus (a vascular proliferation of the cerebral ventricles). The imaging studies performed shortly after birth confirm that K.T. suffered a cerebral infarct during the delivery and most likely as a result of the unnecessary assault on his cerebral blood flow due to the unmonitored hyperstimulation. On May 17, 2005, a MRI revealed acute left MCA infarction involving the opercular regions, left temporal and anterior parietal lobes. Other diagnoses include metabolic acidosis, hyperbilirubinemia, hypernatremia, and hypocalcaemia.

6.13.  K.T. is now seven years old. He requires regular medical care from a variety of medical specialties including pediatric neurology, ophthalmology, physical therapy, occupational therapy, speech therapy, nutrition, and vision therapy. K.T. suffers from static encephalopathy and associated spastic tetraparetic cerebral palsy. He suffers from significant gross and fine motor skills delay, language development delay, and microcephaly (an abnormally small head). K.T. has cortical vision impairment and has undergone three eye muscle surgeries. K.T. cannot ambulate normally due to his central neurologic deficits and requires assistive devices to move. He requires a PEG tube for nutrition and still suffers periodic seizures which may require future neurosurgical

intervention. K.T. exhibits significant expressive and receptive language delays which will greatly impact his future educational and higher learning development. In short, K.T. will be totally dependent on others for most, if not all, of his activities of daily living for the remainder of his life. Because K.T. is ambulatory with assisted devices and will likely be able to communicate some of his basic needs through simple gestures, vocalization and minimal verbal skills, he will most likely live a close to normal life expectancy.

## VII.
## COMPLIANCE WITH FLORIDA STATUTE §766.106 & §766.203

**7.1.** Plaintiffs have complied with the requirements of §766.106 by providing written notice to Defendant of their medical malpractice claim more than ninety (90) days prior to filing suit, and providing Defendant with a list of all known healthcare providers seen by K.T. and all medical records pursuant to §766.106(2)(a).

**7.2.** Plaintiffs have complied with the requirements of §766.203 by conducting an investigation to ascertain that there are reasonable grounds to believe that negligent care was provided by Defendant which caused injuries to K.T., and by providing Defendant with a verified written medical expert opinion of Defendant's negligence. *See* Exhibit A attached.

## VIII.
## CAUSE OF ACTION AGAINST THE UNITED STATES

**8.1.** Defendant, United States of America, was negligent in their care and treatment of Sandra Timmons and K.T. in the following ways, including but not limited to:

1. Failing to properly and timely care for Sandra Timmons and K.T.;
2. Failing to properly and timely treat Sandra Timmons and K.T.;

3. Failing to properly and timely monitor Sandra Timmons and K.T.;

4. Failing to properly and timely diagnose Sandra Timmons and K.T.;

5. Failing to properly and timely deliver K.T.;

6. Failing to properly and timely appreciate the improbability of safe vaginal delivery;

7. Failing to properly and timely diagnose abnormal (compound) presentation prior to delivery;

8. Negligently starting Pitocin with pre-existing adequate to frequent uterine contractions;

9. Failing to discontinue Pitocin in the face of immediate hyperstimulation response;

10. Failing to properly and timely monitor K.T. when presenting signs of distress and rising baseline during prolonged second stage hyperstimulation;

11. Failing to properly and timely institute intrauterine resuscitation through discontinuation of Pitocin and cessation of pushing;

12. Failing to recognize and correct conflation of the maternal heart rate and fetal heart rate; and

13. Failing to place an internal scalp electrode to monitor K.T. due to the conflation of the maternal and fetal heart rate tracing.

8.2. At all times, the persons involved in the medical and health care services provided to Plaintiffs at Fort Walton Beach Medical Center, acting within the course and scope of such employment and providing care authorized by the United States of America, through

its agency, were negligent and proximately caused all injuries and damages sustained by Plaintiffs.

## IX.
## DAMAGES

**9.1.** As a direct and proximate result of Defendant's negligent acts or omissions, Plaintiff K.T. has suffered a permanent brain injury, and continues to suffer severe injuries, including but not limited to, past and future physical pain and suffering; past and future mental pain and anguish; past and future permanent physical impairment; past and future mental impairment; past and future physical disfigurement; past and future medical, health care, and attendant care expenses; loss of enjoyment of life; and loss of earning capacity. Such injuries are, in reasonable probability, permanent in nature. The minor Plaintiff, K.T., through his parents Sandra and David Timmons, brings suit to recover all damages cognizable under the law resulting from the injuries to him as a result of the occurrence in question.

**9.2.** As a direct and proximate result of Defendants' negligence, Plaintiffs Sandra and David Timmons, individually as natural parents of K.T., have been damaged due to their mental anguish suffered in the past, and likely to be suffered in the future, and loss of consortium suffered in the past and in the future as a result of their child's injuries. Sandra and David Timmons are entitled to and claim as damages the reasonable cost and value of all necessary and extraordinary attendant care they have provided in the past and will be providing in the future to their child by the reason of his disabling injuries and resulting medical conditions, and for out-of-pocket expenses, past and future. Sandra and David

Timmons, as natural parents of K.T., claim as damages the past and future medical, health care, and attendant care expenses attributable to K.T. from his date of birth until his 18th birthday (for the sole use and benefit of K.T.). Sandra and David Timmons bring this suit to recover all damages cognizable under the law resulting from injuries to K.T. and to themselves as a result of the negligence at issue.

## CONCLUSION

Plaintiffs request that the Defendant be cited in terms of law to appear and answer this Complaint; that upon final trial and hearing, the Plaintiffs have judgment against the Defendant, for the amount of actual damages; and for such other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other and further relief, at law and in equity, both general and special, to which the Plaintiffs may show themselves entitled and to which the Court believes them deserving.

Respectfully Submitted,

s/ Jamal K. Alsaffar
**JAMAL K. ALSAFFAR**
**Trial Counsel**
Texas State Bar Number: 24027193
**TOM JACOB**
Texas State Bar Number: 24069981
**ARCHULETA, ALSAFFAR & HIGGINBOTHAM**
1100 Lakeway Dr., Suite 101
Austin, Texas 78734
Telephone: 512-266-7676
Fax: 512-266-4646

Attorneys for the Plaintiffs